UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FORTUNET, INC. and MILLENIUM
GAMES, INC.,

        Plaintiffs,

v.

MELANGE COMPUTER SERVICES and
PLANET BINGO, LLC,

        Defendants.

AND RELATED COUNTERCLAIMS.

CV-S-04-1448-PMP (PAL)

CV-S-04-0556-PMP (PAL)

O R D E R

Presently before the Court are Plaintiffs' Markman Claim Construction Brief (Doc. #19); Plaintiffs' Appendix to Markman Claim Construction Brief (Doc. #20); Defendant Planet Bingo, LLC's Markman Claim Construction Brief Regarding the '784 Patent (Doc. #21); Defendants Melange Computer Services and Planet Bingo, LLC's Joint Markman Claim Construction Brief as to the '787 Patent (Doc. #22); Appendix of Exhibits in Support of Defendant Melange and Planet Bingo's Joint Markman Claim Construction Brief as to the '787 Patent (Doc. #23); and Joint Appendix to the Parties' Claim Construction Briefs (Doc. #24), all filed on July 27, 2005. On August 15, 2005, the parties also filed Defendants Joint Markman Claim Construction Rebuttal Brief as to the '787 Patent (Doc. #27); Defendant Planet Bingo, LLC's Markman Reply Brief Regarding the '784 Patent (Doc. #29); and Plaintiffs' Rebuttal Claim Construction Brief (Doc. #28). Defendants also filed a Joint Supplemental Markman Claim Construction Brief as to the

'787 Patent (Doc. #42) on September 7, 2005.  The Court held a hearing on these matters on December 15, 2005.  (Mins. of Proceedings (Doc. #55).)

## I.  BACKGROUND

Plaintiff FortuNet, Inc. ("FortuNet") owns the legal rights to United States patent numbers 4,856,787 (the "'787" patent) and 5,257,784 (the "'784" patent).  (CV-S-04-1448, Compl. (Doc. #1) at ¶ 17; CV-S-04-0556 Third Am. Compl. (Doc. #14) at ¶ 21.)  The '787 patent describes an electronic gaming network on which two or more different games can be executed concurrently on the same player gaming device.  (J.A. to the Parties' Claim Construction Brs. ("JA") (Doc. #24), Ex. 1.)  The '784 patent describes a lottery-type wagering game in which at least one additional random element is added to the game's conventional random elements.  (JA, Ex. 3.)  FortuNet brought suit in this Court alleging Defendants Melange Computer Services, Inc. ("Melange") and Planet Bingo, LLC ("Planet Bingo") infringed the '787 patent.  (CV-S-04-0556, Third Am. Compl.)  Additionally, FortuNet alleges Planet Bingo infringed the '784 patent.  (CV-S-04-1448, Compl.)  The parties dispute the meaning of certain terms within the two patents.  The parties therefore submitted proposed claim interpretations, and this Court held a hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) to construe the disputed claim terms.

## II.  LEGAL STANDARDS

Patent claim construction is a question of law for the Court.  Markman, 517 U.S. at 372.  In interpreting a claim, the court looks first to the intrinsic evidence of record, which consists of the claims, the specification, and the prosecution history.  Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001).  "'Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.'"  Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Among the sources of intrinsic evidence, the starting point is the claim

1   language.  Id.  If the claim language is clear on its face, then consideration of other intrinsic

2   evidence is restricted to determining if those sources show a deviation from the claim's

3   clear language.  Id.

4          The court should give the claim's words their "ordinary and customary meaning."

5   Phillips v. AWH Corp., 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) (en banc) (quotation

6   omitted).  However, the court may construe a claim term differently from its ordinary

7   meaning in at least four instances.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359,

8   1366-67 (Fed. Cir. 2002).  First, if the patentee "acted as his own lexicographer and clearly

9   set forth a definition of the disputed claim term in either the specification or prosecution

10  history."  Id. at 1366.  Second, "if the intrinsic evidence shows that the patentee

11  distinguished that term from prior art on the basis of a particular embodiment, expressly

12  disclaimed subject matter, or described a particular embodiment as important to the

13  invention."  Id. at 1366-67.  Third, if the patentee's chosen term "'so deprive[s] the claim of

14  clarity' as to require resort to the other intrinsic evidence for a definite meaning."  Id. at

15  1367.  Finally, if the patentee phrased the claim in step- or means-plus-function format, "a

16  claim term will cover nothing more than the corresponding structure or step disclosed in the

17  specification, as well as equivalents thereto."  Id.

18         In construing a claim term's ordinary meaning, the court must view the claim

19  terms through the lens of a person of "ordinary skill in the art in question" as of the patent

20  application filing date.  Phillips, 415 F.3d at 1313.  "Importantly, the person of ordinary

21  skill in the art is deemed to read the claim term not only in the context of the particular

22  claim in which the disputed term appears, but in the context of the entire patent, including

23  the specification."  Id.  For example, other claims in the patent in question may assist in

24  determining a claim term's meaning because claim terms normally are used consistently

25  throughout the patent, so use of a term in one claim can clarify the meaning of the same

26  term in other claims.  Id. at 1314.  Additionally, differences between claims within the

1  patent also can be useful because "the presence of a dependent claim that adds a particular

2  limitation gives rise to a presumption that the limitation in question is not present in the

3  independent claim." Id. at 1314-15.  Furthermore, "limitations stated in dependent claims

4  are not to be read into the independent claim from which they depend." Nazomi

5  Communications, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1370 (Fed. Cir. 2005)

6  (quotation omitted).

7          If the claim language is not clear on its face, then consideration of other intrinsic

8  evidence may resolve the ambiguity.  Interactive Gift Exp., Inc., 256 F.3d at 1331.  The

9  specification "'is always highly relevant to the claim construction analysis.  Usually, it is

10  dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415

11  F.3d at 1315 (quoting Vitrionics, 90 F.3d at 1582).  In reviewing the specification, the court

12  must not read into the claims the limitations of particular embodiments and examples

13  appearing in the specification.  Comark Communications, Inc. v. Harris Corp., 156 F.3d

14  1182, 1187 (Fed. Cir. 1998).  The United States Court of Appeals for the Federal Circuit

15  has "expressly rejected the contention that if a patent describes only a single embodiment,

16  the claims of the patent must be construed as being limited to that embodiment." Phillips,

17  415 F.3d at 1323.

18          Additionally, the court may consider the patent's prosecution history, which

19  consists of "the complete record of the proceedings before the [Patent and Trademark

20  Office ("PTO")] and includes the prior art cited during the examination of the patent." Id.

21  at 1317.  The prosecution history "provides evidence of how the PTO and the inventor

22  understood the patent," and it may show whether the patentee "limited the invention in the

23  course of prosecution, making the claim scope narrower than it would otherwise be." Id.

24  However, "because the prosecution history represents an ongoing negotiation between the

25  PTO and the applicant, rather than the final product of that negotiation, it often lacks the

26  clarity of the specification and thus is less useful for claim construction purposes." Id.

1    If a claim limitation is not clear after reviewing all intrinsic evidence, then the

2    court may refer to extrinsic evidence such expert testimony, inventor testimony,

3    dictionaries, and learned treatises.  Id.; Interactive Gift Exp., Inc., 256 F.3d at 1332.

4    However, "[s]uch instances will rarely, if ever, occur."  Interactive Gift Exp., Inc., 256 F.3d

5    at 1332 (quoting Vitronics, 90 F.3d at 1585).  Additionally, the court may consider extrinsic

6    evidence throughout claim construction to understand the underlying technology.  Id.

7    Counsel for the parties have thoroughly briefed their analysis of the claims at

8    issue in light of the foregoing standards.  Having considered their arguments, the Court

9    hereby makes the following construction of claims for the patents in suit.

10   **III.  THE '787 PATENT**

11   The parties dispute the meaning of certain terms within independent claim 1 of

12   the '787 patent.  Claim 1 reads as follows:

13        1.  Game network comprising at least one master game device
          interconnected with at least one slave game device; said slave game
14        device executing concurrently at least two different distinct and
          independent games; each of said different distinct and independent
15        games comprising its own unique rules of play and unique random
          factors; said different distinct and independent games including bingo,
16        keno, poker, blackjack, roulette, slots, gin, and sports book; said master
          game device providing data for playing said games; and at least one of
17        said two different distinct and independent games being at least
          partially responsive to said data from said master game device.

18

19   (JA0011, Col. 6 at 18-30.)  This Court construed this claim in prior litigation in which

20   FortuNet alleged Stuart Entertainment, Inc. infringed the '787 patent (hereinafter the

21   "Stuart litigation").  (See Pls.' App. to Markman Claim Construction Br. (Doc. #20), Exs.

22   H, I.)  In the Stuart litigation, the Court construed the phrase "Game network comprising at

23   least one master game device interconnected with at least one slave game device" as

24   follows:

25

26        An arrangement of communicating data processing devices.  The
          processing takes place at the nodes of the network.  The game network

1   must include at least one or more primary device for playing the game
2   and one or more secondary device for playing the game.  The primary
    device at least partially controls the secondary device.

3   (Doc. 20, Ex. H.)  The parties now dispute the meaning of particular terms within this

4   phrase as well as other terms in claim 1.  Specifically, the parties dispute the meaning of the

5   terms "slave game device," "interconnected," "execute concurrently," and "different

6   distinct and independent games."

7   **A.  Slave Game Device**

| Plaintiff FortuNet's Proposed Construction | Defendants Melange and Planet Bingo's Proposed Construction |
|---|---|
| One or more secondary computer devices for playing games within the game network, partially controlled by the master game device. | An intelligent (smart) game terminal that has a microprocessor, local data input and output means, and a transceiver.  The slave game device is interconnected with the master game device via a network.  It is capable of transmitting game information to the master, and capable of receiving commands and data from the master. |

Defendants argue the patent specification sets forth the minimal hardware

configuration for a slave game device, and thereby limits the definition of this term to at

least those hardware components.  One of these components is a transceiver, which

Defendants argue by definition must be capable of both receiving and transmitting data.

Defendants also argue the specification requires the slave game device be capable of

transmitting data to the master device because the specification states communication

between master and slave is bi-directional.  Defendants differentiate dependent claim 6,

which requires the slave send game status and accounting data to the master, from

independent claim 1.  Defendants assert claim 6 requires the actual transmission of the data,

whereas Defendants' definition of "slave game device" would require it merely to be

capable of such transmission through means such as a transceiver.  Defendants note claim 6

does not specify any means for transmitting the data because independent claim 1's

1    definition of "slave game device" already includes transceiver means.

2           FortuNet responds that nothing in claim 1's language requires the slave be

3    capable of transmitting data to the master.  FortuNet also argues the specification's

4    reference to bi-directional communication is in the context of the preferred embodiment.

5    With respect to the minimal hardware configuration, FortuNet argues this is only a

6    description of the preferred embodiment, not a definition of "slave game device."

7           Figure 2 in the patent application shows a diagram of a slave game device.

8    (JA003.)  The patent specification states:

9           Although the FIG.2 shows only the simplest, minimal hardware
            configuration of the slave game device, the opportunities of playing a
10          broad number of different games within the framework of the
            suggested game network can be greatly enlarged by expansion of the
11          input and output (I/O) means 11 of the slave game device 7 as shown
            in FIG. 7.

12

13   (JA0010, Col. 4 at 29-35.)   The description of the preferred embodiment states Figure 2 is

14   "an intelligent (smart) game terminal comprising the microprocessor 10, the local data input

15   and output means 11 including the keypad 8, and the transceiver 12, the latter providing the

16   direct interface with the rest of the network 6 via the coaxial cable 13."  (JA0009, Col. 2 at

17   57-62.)

18          Defendants argue that because the specification describes Figure 2 as the

19   "minimal" hardware configuration for a slave game device, and further describes Figure 2

20   as containing a transceiver as part of this minimal configuration, the patentee defined the

21   slave game device to include a transceiver.  Defendants argue that, by definition, a

22   transceiver both sends and receives information, so a slave game device must be capable of

23   both sending and receiving data, even if claim 1 does not require that it actually makes the

24   communication back to the master game device.

25          Beginning with the claim language, claim 1 does not define the term slave game

26   device other than that it be connected through the network to the master, that it execute

concurrently two games, and that it is at least partially controlled by the master.  (JA0011, Col. 6 at 18-30.)  The claim language does not suggest a minimal hardware configuration requiring the slave be capable of transmitting data to the master.

The specification states the minimal configuration of a slave game device includes a transceiver, implying anything less than that would not qualify as a slave game device.  However, the specification makes this comment in the context of describing the preferred embodiment.  The preferred embodiment includes bi-directional communication, so for the preferred embodiment, this would be the minimal configuration.  The discussion of the minimal configuration in context of the preferred embodiment therefore is not necessarily definitional of the general claim term "slave game device."  While the slave game device must have some means of connecting to the network and receiving commands from the master, claim 1 does not define a "slave game device" to include the capability of transmitting information back to the master.  Nothing in the prosecution history suggests the patentee limited or altered the meaning of this term to require the capability of bi-directional communication.  The Court therefore holds a "slave game device" means "a secondary data processing device for playing games which is connected to the game network and is at least partially controlled by the master game device."

### B.  Interconnected

| Plaintiff FortuNet's Proposed Construction | Defendants Melange and Planet Bingo's Proposed Construction |
| --- | --- |
| To connect with one another. | Connection providing two-way communication between the slave and master. |

Noting the claim term is "interconnected" and not just "connected," Defendants argue this term requires that the flow of information between the master and slave devices be bi-directional, that is, both the master sending information to the slave, and the slave sending information to the master.  Additionally, Defendants assert the patent states the

1   slave game device's minimal configuration includes a transceiver to permit both the receipt

2   and transmission of information with the master game device over the network.  Defendants

3   also note the specification states communication between the master game device and the

4   slave game device is bi-directional.  According to Defendants, the patent does not teach a

5   game where communication between master and slave is one way.

6          FortuNet asserts the claim's terms require only one-way communication, master

7   to slave.  First, FortuNet argues that dependent claim 6 adds to independent claim 1 the

8   limitation of the slave sending information to the master, suggesting that is not a limitation

9   of claim 1.  Second, FortuNet notes that although the specification discusses the slave

10  sending game information to the master, that is a description of the preferred embodiment,

11  not a definition of "interconnected."   Finally, FortuNet argues that the specification states

12  the slave game device can execute games independently, absent communication with the

13  master.  FortuNet argues requiring bi-directional flow of information would contradict this

14  language in the specification.

15         The Court begins with the claim language which states the "master game device

16  provid[es] data for playing said games; and at least one of said two different distinct and

17  independent games being at least partially responsive to said data from said master game

18  device." (JA0011, Col. 6 at 26-30.)  By its terms, the claim describes one-way

19  communication where the master sends data to the slave.  A review of the specification does

20  not alter this interpretation.  Although the specification mentions bi-directional

21  communication, it does so in the context of describing the preferred embodiment.  (JA0010,

22  Col. 3 at 66-68, Col. 4 at 1-10.)  In discussing the bi-directional nature of the

23  communication, the specification states the slave will send "game status information and

24  accounting data" back to the master.  (JA0010, Col. 3 at 67-68, Col 4 at 1-2.)  This is a

25  direct reference to dependent claim 6, which adds the limitation that the slave send

26  "accounting data and the current status" of at least one of the games back to the master.

(JA0011, Col. 6 at 56-59.)[1]  Nothing in the prosecution history suggests the patentee limited or altered the meaning of this term to require bi-directional communication.

In construing a patent's terms, the Court should not limit the patent to the preferred embodiment description.  Comark Communications, Inc., 156 F.3d at 1187.  Additionally, a limitation in a dependent claim generally implies the limitation is not in the independent claim.  Nazomi Communications, Inc., 403 F.3d at 1370.  The Court therefore will not limit claim 1 to the preferred embodiment or read dependent claim 6's limitation into independent claim 1.  The Court therefore holds "interconnected" in independent claim 1 means "connected with one another."

**C.  Executing Concurrently**

| Plaintiff FortuNet's Proposed Construction | Defendants Melange and Planet Bingo's Proposed Construction |
|---|---|
| Executing a computer program that allows the play of 2 games within the same interval of time. | Playing simultaneously. |

Defendants argue the patent specification and prosecution history use the terms "execute" and "concurrently" interchangeably with "play" and "simultaneously."  Defendants also assert this Court previously ruled "execute concurrently" means "play simultaneously" in the Stuart litigation.  Defendants contend that during prosecution, the patentee distinguished prior art on the basis that the '787 patent discloses the limitation of playing more than one game at a time.  Defendants thus argue this term cannot mean play consecutively or play in turn.  Additionally, Defendants note that during the Stuart litigation, FortuNet argued that the patent defined concurrent play as the device concurrently executing two games.  Defendants therefore argue FortuNet is judicially

---

[1]  Dependent claim 6 states:  "The combination in claim 1, wherein said slave game device transmits to said master game device accounting data and the current status of at least one of said two different distinct and independent games."  (JA0011, Col. 6 at 56-59.)

estopped from arguing otherwise.  In response to FortuNet's proposed construction, Defendants assert FortuNet improperly relies on dictionary definitions, i.e. extrinsic evidence, rather than intrinsic evidence.  Defendants note that FortuNet's terms of "computer program" and "interval of time" do not appear in the patent claim language, the specification, or the prosecution history.

FortuNet argues its definition is consistent with computer dictionary definitions of "execute" and "concurrent."  FortuNet asserts the computer need not actually perform the commands simultaneously, but rather within the same interval of time, because a computer executes only one software command at a time, even if it appears to the player that it is happening simultaneously.  FortuNet also argues this Court previously interpreted this term to mean both games need not be displayed at the same time.  One game can be played in automatic mode in the background without human interaction or display.

The claim language does not define "execute concurrently."  However, the specification and prosecution history frequently use the terms "execute" and "concurrently" interchangeably with "play" and "simultaneously."  (See, e.g., JA0001; JA0009, Col. 1 at 25-35 & 50-53, Col. 2 at 12-16; JA0011, Col. 5 at 37-43; JA0044-45; JA0074-75; JA0161.)  The patent claim language, the specification, and the prosecution history do not refer to executing a computer program over the "same interval of time."

The specification's reference to the invention's computer aspects states that the master game device runs under a multitasking operating system where each task is executing a separate game, such as bingo or keno.  (JA0010, Col. 3 at 13-25.)  Additionally, each game could be displayed in a separate display window on the display screen.  (JA0010, Col. 3 at 25-34.)  The specification further states that because of "the wide availability of plentiful information in multitasking operating systems and display windowing techniques, we omit the details of implementation of the operating system 14, the concurrent tasks 15,

1  and the windows 20, 24, 26, and 28."[2]  (JA0010, Col. 3 at 40-45.)

2      In finding the defendant in the Stuart litigation infringed the '787 patent, this

3  Court stated that the '787 patent's use of the term executing concurrently "requires that the

4  device play two games at once." (Defs.' App., Ex. 3 at 12.)  In re-examining this claim

5  term, the Court reaches the same conclusion.  The phrase "execute concurrently" means

6  playing two games simultaneously, or at once.  The specification and prosecution history

7  are replete with examples of the patentee interchangeably using these terms.  However, the

8  Court also finds "play simultaneously" must be viewed in context of the specification,

9  which states a multitasking operating system where each task is a game achieves

10  simultaneous play.  The Court therefore holds "execute concurrently" means "play

11  simultaneously, i.e. at once, through a multitasking operating system where each task is a

12  game.  One of those games could operate in the background while the other is played with

13  human interaction."  (See Pls.' App. to Markman Claim Construction Br. (Doc. #20), Ex. H

14  at 33-34.)

15  **F.  Different Distinct and Independent Games**

| Plaintiff FortuNet's Proposed Construction | Defendants Melange and Planet Bingo's Proposed Construction |
|---|---|
| Two or more games that have different rules and random factors. | Two very dissimilar games able to reach a winning stage independently, without regard to the status of the other.  Each game must operate with unique rules of play and unique random factors from the other.  For example, the games cannot share a random number generator or ball blower. |

22

23      Defendants argue the claim term "different distinct and independent games" does

24  not permit playing two games of the same type because during prosecution the patentee

25

26     [2]  Although the patentee stated such information was "wide[ly] available," the specification does not cite to any reference for such materials.

1  continually narrowed the term in response to the PTO's rejections based on prior art.

2  Defendants argue the patentee narrowed the claim in three ways:  (1) by listing the types of

3  different distinct and independent games; (2) by differentiating a single bingo game as

4  using a different random number generator; and (3) by describing the different distinct and

5  independent games as "very dissimilar."

6        FortuNet argues this Court previously interpreted the claim to mean if the two

7  games have a difference in rules and random factors they are unique.  FortuNet asserts the

8  two games can be of the same type, such as concurrently playing two bingo games,

9  particularly because the specification uses the example of two concurrent bingo games.

10  FortuNet denies the patentee narrowed or abandoned this meaning during prosecution.

11        In the Stuart litigation, this Court interpreted "different distinct and independent

12  games" as follows:

13        If the games have a difference in the rules of play and random factors,
          they are unique.  Both the rules of play and random factors must
14        contain a difference, a game with different rules of play and nonunique
          random factors would not be covered by the language of the claim.
15

16  (Pls.' App. to Markman Claim Construction Br., Ex. H at 35.)  The Court concludes this

17  remains the proper construction of this claim limitation.  With respect to playing two of the

18  same type of game, the specification itself states that the patent contemplates the player

19  playing two different bingo games at the same time.  (JA0011, Col. 5 at 37-43.)

20        Although during patent prosecution the patentee refined this term to overcome

21  the patent examiner's rejection of the claim, a review of this history does not suggest the

22  patentee abandoned the simultaneous play of two games of the same type.  The initial patent

23  application disclosed the limitation of playing two games simultaneously.  (JA0022.)  The

24  patent examiner rejected this language, stating prior art taught the simultaneous play of two

25  games over a network.  (JA0036.)  In response, the patentee added the words "distinct and

26  independent" to describe the games.  (JA0044.)  The examiner again rejected the claims,

13

1   explaining that "distinct and independent games" was covered by a prior Itkis patent which

2   allows a player to play two separate bingo cards.  (JA0048; JA0050-51; JA0082.)  The

3   examiner stated that the "games are distinct because they are on two different cards.  They

4   are independent in that matches occur on each card independent of the other card."  (Id.)

5   The examiner noted that because the application did not define the word "games," the claim

6   language was broad enough to include two bingo cards within the same overall bingo game.

7   (JA0050-51.)  The patentee again amended the claim by adding "different" to the distinct

8   and independent games, as well as including additional new language regarding the unique

9   rules of play and unique random factors and listing the types of games.  (JA0054.)  The

10  PTO thereafter approved the application.  (JA0085.)

11          Viewing this prosecution history, the patentee did not surrender playing two

12  bingo games at the same time, so long as those bingo games had unique rules of play and

13  unique random factors.  The patentee listed the types of games to overcome the patent

14  examiner's interpretation that two bingo cards within a single bingo game could constitute

15  "games" under the patent because the patent did not define "games."  The patentee defined

16  "games" to include bingo, poker, etc., to show that "games" did not include two bingo cards

17  within the same bingo game.

18          This determination is consistent with this Court's ruling in the Stuart litigation in

19  which the Court found the defendant's device which permitted simultaneous play of two

20  different distinct and independent bingo games infringed claim 1 of the '787 patent.  The

21  Stuart litigation involved the play of regular bingo along with a game called bonanza bingo.

22  The Court found the defendant's device infringed the '787 patent because it permitted the

23  play of both regular and bonanza bingo at the same time.  (Defs.' App., Ex. 3.)  Although

24  both games were bingo games, regular bingo and bonanza bingo had different rules and

25  different random factors, thus making them different distinct and independent under

26  claim 1.  (Id.)

14

1      Defendants also argue that even if claim 1 includes the simultaneous play of two

2  bingo games, to be different distinct and independent games, the two bingo games cannot

3  use the same blower or random number generator.  Defendants argue that the patent cannot

4  cover two bingo games using the same blower or random number generator because during

5  prosecution, the patentee specifically noted that a single bingo game would not use the same

6  blower or number generator as another bingo game:

> A single (bingo) game is defined as a unique game distinct and
> independent from another bingo game or any other (non-bingo) game
> by a number of factors including but not limited to a single random
> number generator ("ball blower") and a single prize ("pot") to be
> shared by all the winners.  The fact that a player may possess more
> than one bingo card does not convert a single game into a plurality of
> distinct and independent games.  Similarly, the fact that two or more
> players simultaneously play the same (bingo) game does not convert
> this game into a plurality of distinct and independent bingo games.
>      The difference between a single bingo game and a single poker
> game is even more obvious than the difference between two bingo
> games being played at different times and/or in different places
> (assuming independent prizes and independent random number
> generator processes for the bingo games).

(JA0045.)

16      The claim language does not support Defendants' position.  Nothing in claim 1

17  indicates two bingo games must use different random number generators to be different

18  distinct and independent.  The specification does not make this distinction either.  This

19  Court rejected Defendants' position in the Stuart litigation where the Court found

20  infringement even though the regular bingo game and the bonanza bingo game used the

21  same blower.  (Defs.' App., Ex. 3 at 14.)  The Court noted that although the games shared

22  the same blower for selecting numbers, bonanza bingo had a different random factor

23  because players could swap out their bingo cards during the bonanza bingo game, which

24  they could not do during the regular bingo game.  This created a unique random factor

25  between the games, thus satisfying the patent language.  Consequently, the bingo games

26  need not have a separate bingo ball blower or random number generator so long as they

1   have another difference in random factors and rules of play.

2       The prosecution history does not alter this conclusion.  The patentee noted that a

3   single bingo game is distinct from another by a number of factors "including but not limited

4   to" a single random number generator and prize pot.  (JA0045.)  Reviewing this comment in

5   the context of the prosecution, the patentee was attempting to distinguish a bingo game

6   from the individual bingo cards being played within that game.  It is not evident that the

7   patentee was attempting to identify different random number generators as the only way to

8   differentiate one bingo game from another bingo game.  The Court will not impose a

9   limitation which is not expressed by the claim language and is contrary to the specification

10  based on an isolated comment in the ongoing negotiation between the patentee and the

11  PTO.  This is particularly appropriate when the statement is viewed contextually.  It is

12  unclear whether the patentee intended to narrow the scope of his claimed invention or was

13  attempting to explain to the examiner the difference between two bingo games as opposed

14  to the difference between a bingo game and a bingo card.  Furthermore, in a subsequent

15  amendment the patentee added the language requiring the two games to have unique

16  random factors and unique rules.  (JA0054.)  The patentee thereby clarified through specific

17  claim language what distinguishes two different distinct and independent games.

18      Finally, Defendants argue that during prosecution, the patentee surrendered the

19  play of two bingo games because he stated the two different games must be "very

20  dissimilar," and then listed the type of games, such as bingo, poker, keno, etc.  Defendants

21  thus argue to be "very dissimilar," the games must be of a completely different type.

22  However, two bingo games could be "very dissimilar" if they had different rules of play and

23  random factors.

24      The Court therefore holds that "different distinct and independent games" means

25  "the games are unique if they have a difference in the rules of play and random factors.

26  Both the rules of play and random factors must contain a difference.  A game with different

rules of play and nonunique random factors would not be covered by the claim language. The two games can be of the same type and can use the same ball blower or random number generator so long as some other difference in the rules of play and random factors exists."

**IV.  THE '784 PATENT**

The dispute on claim terms for the '784 patent involves only Plaintiff FortuNet and Defendant Planet Bingo.  Claim 1 of the '784 patent reads as follows:

> A method of playing a lottery-type wagering game whose outcome is
> determined by a random selection of only some of a plurality of
> discrete lottery elements of that game comprising the steps of:
>> adding to the plurality of lottery elements at least one separate
>> and discrete additional element;
>> playing of the game by at least one participant, including
>>> wagering a lottery wager on a chance occurrence of a selection of
>>> certain lottery elements during a play of the game including a
>>> selection of some ones of the lottery elements,
>>> wagering an additional wager on a chance occurrence of the
>>> at least one additional element being selected during the
>>> selection of some ones of the lottery elements, and
>>> subsequent to said wagering steps, randomly selecting of
>>> some ones of all of the elements including a plurality of the
>>> lottery elements to determine an outcome of the game;
>> settling of the wagers of the chance occurrence of the additional
>> element being included with the some ones of the elements
>> selected; and
>> settling of the wagers of the chance occurrence of the certain
>> lottery elements being included with the some ones of the
>> elements selected during the play of the game.

(JA0206.)  The parties' disputes on this patent center around two primary terms, a "lottery-type wagering game," and "separate and discrete additional elements."

**A.  "Lottery-type wagering game"**

| Plaintiff FortuNet's Proposed Construction | Defendant Planet Bingo's Proposed Construction |
|---|---|
| A game whose outcome is determined by a random selection of only some of a plurality of discrete lottery elements of that game. | A game in which a fixed number of lottery elements are randomly selected.  A player having a lottery ticket that matches the lottery elements selected wins, without any requirement that the lottery elements be in a particular pattern on the player's ticket or card. |

Planet Bingo argues that during prosecution history the patentee restricted this patent to the lottery game depicted in Figures 9-12 of the specification in an effort to distinguish prior art.  Among the features of the game in Figures 9-12 is (a) a prescribed set number of balls is always drawn (as opposed to bingo where the number of balls drawn is not fixed); and (b) a lottery player who matches all the balls drawn wins (as opposed to bingo, where a player conceivably could match all balls drawn but not make out the pattern for the game).  Planet Bingo argues FortuNet is attempting to recapture through litigation what it expressly abandoned during patent prosecution by expanding the patent beyond the invention described in Figures 9-12.  Planet Bingo thus argues claim 1 of the '784 is restricted to the game depicted in Figures 9-12, including its features of a fixed number of balls being drawn and the drawing of an additional element affecting the player's odds of winning.  Planet Bingo also seeks to impose the requirement that the player purchase a lottery ticket, as described in the specification.

FortuNet argues its proposed construction reflects the claim language's usual and ordinary meaning.  FortuNet denies the patentee limited the claim to the game depicted in Figures 9-12 because claim 1 was a generic claim which includes embodiments beyond Figures 9-12.  Additionally, FortuNet notes the specification identifies bingo as a possible game under this patent.  FortuNet contends the claim language does not require calling a fixed number of balls or purchasing a lottery ticket.

### 1. Ticket

Planet Bingo argues the patent requires the lottery player to purchase a lottery "ticket."  Planet Bingo asserts this is how lottery games usually are played.  Additionally, Planet Bingo notes the specification states the lottery game involves the purchase of "the usual ticket."  (JA206, Col. 19 at 43-45.)  FortuNet argues the claim language does not require purchasing a ticket.

1    Nothing in claim 1's plain language requires the player to purchase a ticket.  The

2    patent's only reference to purchasing a ticket is done so in the discussion of the preferred

3    embodiment in the specification.  The Court will not impose a limitation from the preferred

4    embodiment not supported by the claim language or surrendered during prosecution.

5    Nothing in the prosecution history suggests the patentee narrowed the claim to involve

6    purchase of a ticket.  Claim 1 does not require the purchase of a "ticket."

7                              2.  Restriction During Prosecution

8    Planet Bingo argues that during prosecution, the patentee restricted his claims

9    only to the embodiment reflected in Figures 9-12 of the patent.  This embodiment involves

10   the drawing of a fixed number of lottery elements.  For instance, in the actual embodiment

11   in Figures 9-12, nine balls are drawn.  The player must match six out of nine balls to win.

12   In addition to the numbered balls, additional no value "chance" balls are added to the mix.

13   If the no-value additional elements are selected, the odds of the player achieving a match

14   with six numbers is reduced.  For example, if one chance ball is selected, the player must

15   match six of the remaining eight numbers, so his odds of winning are reduced.  If two or

16   three chance balls are selected, the odds of matching six numbers are reduced even further.

17   FortuNet admits that during patent prosecution the patentee restricted his claims.

18   However, FortuNet argues claim 1 remained generic and covers any embodiments falling

19   within the claim's terms, including Figures 6 and 8 in the specification.  Additionally,

20   FortuNet notes the specification states the game method could be adapted to bingo.

21   If an applicant claims two or more independent and distinct inventions in one

22   application, the PTO may require the patentee to restrict the application to one of the

23   inventions.  35 U.S.C. § 121; 37 C.F.R. § 1.142.  The applicant must reply to the restriction

24   and either oppose the restriction, or elect an invention to which the claims will be restricted.

25   37 C.F.R. § 1.142; § 1.143.  The unelected claims are either canceled or withdrawn from

26   further consideration by the patent examiner, subject to reinstatement if the restriction is

withdrawn or overruled. 37 C.F.R. § 1.142.  However, an applicant may claim more than one species of an invention in one application so long as the application also includes "an allowable claim generic to all the claimed species and all the claims to species . . . are written in dependent form . . . or otherwise include all the limitations of the generic claim." 37 C.F.R. § 1.141(a).

With respect to the '784 patent, the PTO issued a restriction office action, identifying three distinct species in the claimed invention: (1) Figures 9-12 associated with claims 2-4; (2) Figures 3-7 associated with claims 5-10 and 20; and (3) Figure 8 associated with claims 11-19 and 21-33.  (JA0274.)  The patent examiner noted that at that point, claim 1 was generic.  (Id.)  The patent examiner directed the patentee to elect a single species for prosecution.  (Id.)

In a telephone conversation, the patentee elected not to oppose the restriction, and elected "to prosecute the invention of Figures 9-12, claims 1-4."  (Id.)  The patent examiner withdrew claims 5-23 from further consideration as non-elected.  (JA0275.)  By amendment, the patentee confirmed in writing the election to the species in Figures 9-12, and added new claims 24-31 directed to this species.  (JA0288.)

In addition to the restriction, the patentee amended claim 1 several times in response to the patent examiner's rejections.  First, the patent examiner rejected claims 1-4 as anticipated by the Grossman patent.  (JA0275-76.)  Grossman discloses a craps game that adds colors to the die faces.  (JA0275.)  The player can place a wager on the usual game, and an additional wager on the colors.  (Id.)  In response to this rejection, the patentee added the words "single" and "discrete" to describe the additional elements and clarified the distinction between his invention and Grossman as follows:

> [Under the Grossman disclosure,] each roll of a dice produces a combination of a number and a color.
> . . . In the present invention, the selection of the additional symbol is made independently (not in combination with another symbol), or as the Examiner noted there is a separate "game piece" for

1
> each of the usual symbols and the (or each) additional symbol.
2
> . . . [The] elements have been further described as being "discrete" and "single" to help differentiate the individual game "pieces" of the present invention from the combination number/color
3
> faces of the dice of the Grossman patent.

4   (JA0289-90 (emphasis in original).)

5       The patent examiner again rejected the claims, but this time as unpatentable over

6   the Thanet patent.  (JA0297.)  Thanet discloses a roulette game which adds to the usual

7   roulette wheel a spot for the "players pool."  (Id.)  Players can wager on the usual roulette

8   game and the additional element of the players pool.  (Id.)

9       Following this rejection, the patentee and examiner conducted an interview on

10  April 22, 1993.  (JA0330; JA0281.)  At the interview, the patentee proposed changes to

11  claim 1.  (JA0330; JA0281.)  Among other changes, the patentee proposed that claim 1 be

12  modified to disclose a game in which a "set number" of lottery elements are selected, and in

13  which "the selection of the additional element [does] not affect[] the chance occurrence of

14  the first-mentioned wagering step."  (JA0281.)

15      The patentee subsequently filed a formal amendment in response to the

16  examiner's rejection based on Thanet.  (JA0303.)  In this amendment, the patentee did not

17  include the language from the proposed amendment offered during the April 22, 1993

18  interview.  Instead, the patentee made two relevant changes.  First, he deleted the word

19  "single" from the prior amendment distinguishing Grossman, but added the word "separate"

20  to describe the "at least one separate and discrete additional element."  (Id.)  Second, he

21  added the words "lottery-type" wagering game to differentiate from Thanet, which was a

22  roulette game selecting only one spot on the wheel, as opposed to a lottery game in which

23  several elements would be selected.  (Id.; JA0308.)  In the remarks of this amendment, the

24  patentee stated the following:

25
> Initially, it is noted that an interview with the Examiner was conducted on April 22.  This interview was very helpful - but unfortunately the
26
> undersigned did misstate a feature of the invention, at least insofar as

one embodiment thereof is concerned, which needs to be corrected.  In
one embodiment, a certain number of lottery balls are selected, and if
an additional ball is selected then another lottery ball will be selected.
In this embodiment, the odds of the lottery bet are not affected by the
presence or selection of the additional ball(s).  This was indicated at
the interview, and proposed in language added to the claim presented
at that time.  However, in the other embodiment which is particularly
described with respect to Figures 9-12, the additional ball will take the
place of a lottery ball when selected (with a plurality of other lottery
elements), which does affect the odds.  In view of this, it will be
appreciated that the language about not affecting the odds is not
present in the independent claims presented in this Amendment.

(JA0307-08.)  Additionally, the patentee noted that dependent claims 24 (now claim 5) and

30 (now claim 11) "have been amended for consistency with the amendments made to the

independent claims from which they depend and in particular that the 'single' and

'individual' nature of the game pieces is now part of the independent claims."  (JA0309.)

The patent examiner subsequently concluded that claims 1-4 and 24-33 were allowable, and

noted the applicant approved the cancellation of claims 5-23.  (JA0310-12.)

The parties dispute the meaning of this prosecution history.  Planet Bingo argues

the patentee restricted himself to the specific embodiment in Figures 9-12, and that claim 1

did not remain generic.  Planet Bingo argues that because the '784 is restricted to the

embodiment in Figures 9-12, the number of elements drawn to determine the winner must

be "fixed," that is, a certain number must be drawn each time.  Planet Bingo also notes this

is a standard feature of lottery-type games, where a certain number of elements are drawn

which players try to match.  FortuNet responds that although the patentee restricted his

application to the embodiment in Figures 9-12, claim 1 remained generic throughout

prosecution and allowance.  FortuNet therefore argues there is no basis for limiting claim 1

to an embodiment in which only a "fixed" number of balls are drawn.  Further, FortuNet

notes that dependent claim 2 has a "set number" of drawn elements, so presumptively that

limitation is not in claim 1.

1       The Court begins with the claim language, which does not require a fixed number

2  of balls be drawn or that the player's odds of winning are affected when an additional

3  element is drawn.  However, during prosecution, the patentee restricted his application to

4  the embodiment in Figures 9-12.  The embodiment in Figures 9-12 depicts a game in which

5  a fixed number of balls are drawn.  In the particular illustration in Figures 9-12, nine balls

6  are drawn.  Because the number of elements are fixed, the odds of a player matching six of

7  the nine balls is affected if one or more no-value additional elements are drawn.  If claim 1

8  is limited to the specific embodiment in Figures 9-12, then drawing a "fixed" number of

9  elements would be a limitation of claim 1.

10      However, the patentee pursued claim 1 as generic.  The patentee's intent to keep

11 claim 1 generic is illustrated by the proposed changes in the April 22, 1993 interview and

12 the patentee's subsequent explanation about why he did not include the proposed language

13 in his formal amendment.  At the 1993 interview, the patentee proposed altering claim 1 to

14 include language about drawing a "set number" of elements, as well as language about how

15 this would affect the odds of drawing other elements.  In the subsequent formal amendment,

16 the patentee explained he did not include this language in claim 1 because in one

17 embodiment of the claimed invention, the odds would not be affected by drawing an

18 additional element.  It is only in the embodiment reflected in Figures 9-12 that the odds-

19 affecting feature occurs.  Accordingly, the patentee did not include the "set number"

20 limitation in the independent claims because that would limit the otherwise generic claim 1

21 to only the fixed element/odds affecting embodiment in Figures 9-12.  The patentee's

22 removal of that language therefore reflects the patentee's intention to keep claim 1 generic

23 and not limited to the embodiment in Figures 9-12.

24      This understanding of the prosecution history is bolstered by a review of

25 dependent claim 2.  Dependent claim 2 discloses the wagering game in claim 1 "wherein

26 said wagering a lottery wager step includes the step of choosing of a set number of the

discrete lottery elements; and wherein the selecting step includes the selecting of the set number plus the number of additional elements available to be selected." (JA0206.) Claim 2 describes the embodiment in Figures 9-12. It includes the limitation of selecting a "set number" of the lottery elements. Additionally, because the number of drawn elements will be the "set number plus the number of additional elements available to be selected," the drawing of an additional element will affect the player's ability to match the remaining elements drawn. A limitation in a dependent claim presumptively is not a limitation in the independent claim. Further, the patentee's use of the words "set number" of lottery elements drawn in both claims 2 and 7 demonstrates the patentee knew how to express this feature when he meant to include it as a claim limitation.

Based on the claim language, prosecution history, and claim differentiation principles, the Court finds claim 1 is generic, and is not restricted to the embodiment in Figures 9-12. Claim 1 does not require either a "fixed" number of elements be drawn, or that the drawing of an additional element affect the odds of a player achieving a match with the discrete lottery elements. The Court therefore holds "lottery-type wagering game" means "a game whose outcome is determined by a random selection of only some of a plurality of discrete lottery elements of that game." (See JA0206, Col. 20 at 24-28.)

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

**B.  Separate and discrete additional element**

| Plaintiff FortuNet's Proposed Construction | Defendant Planet Bingo's Proposed Construction |
| --- | --- |
| An element having no value, and not being available for designating by the player as one of the winning numbers or symbols of the usual lottery series. | Discrete elements that have no value.  The additional elements are each represented by a separate game piece that is separate and discrete from the lottery elements.  The additional elements are selected independently of the discrete lottery elements, and may not be "mixed in" or "combined" with a lottery element.<br><br>Planet Bingo also would define "discrete lottery elements" as:  Discrete elements that have value.  The values of the lottery elements that are drawn to determine the outcome of the lottery.  The lottery elements must be separate and distinct from the additional elements, and may not be combined or mixed with them. |

The parties dispute whether the "separate and discrete additional element" can be combined with the discrete lottery elements, for example by adding the additional element of color to a discrete lottery element like a number.  FortuNet asserts that adding color to the number was one of the specific embodiments in the specification as shown in Figure 6.  FortuNet also contends the claim language does not indicate the additional element must be another game piece.  Additionally, FortuNet argues the patentee withdrew its distinction of the Grossman patent, and therefore the patentee's statements related to that distinction no longer apply.  FortuNet also argues dependent claim 5 includes the limitation of separate game pieces, so this limitation should not be read into independent claim 1.

Planet Bingo argues the claim language requires the additional elements be "discrete," "separate," and "distinct" from the discrete lottery elements.  Planet Bingo contends the patentee had to make these distinctions to overcome the Grossman reference which mixed together both the usual element and an additional factor by coloring the die

face.  Planet Bingo notes this interpretation is consistent with the embodiment in Figures

9-12, and requiring the additional element to be a unique game piece is critical to the

invention's operation because each additional element drawn affects the player's odds of

matching the remaining lottery elements drawn.  Planet Bingo further continues its

argument that FortuNet cannot rely on other embodiments in the specification other than

Figures 9-12 because the patentee elected not to pursue those embodiments.

Claim 1's plain language requires the additional element to be "separate and

discrete" from the discrete lottery elements.  Separate does not mean combined.  The plain

meaning is bolstered by the patentee's own statements during prosecution.  In response to

the examiner's rejection, the patentee distinguished his invention from Grossman by stating

Grossman combined elements whereas the present invention had entirely separate game

pieces.  The prosecution history does not support FortuNet's assertion that the patentee

withdrew this distinction in a subsequent amendment.  First, the patentee did not expressly

withdraw his distinction of Grossman.  Second, in the same amendment the patentee

removed the word "single" which he originally used to distinguish Grossman, he inserted

the word "separate" to describe the additional elements.  FortuNet offers no explanation for

what significance the Court should give to the word "separate," and is unable to articulate a

difference between "single" and "separate."  Further, the patentee made no effort to

distinguish Grossman on a different basis during the subsequent amendment.  Finally, in the

amendment in which the patentee added the word "separate," he remarked that the

dependent claims "have been amended for consistency with the amendments made to the

independent claims from which they depend and in particular that the 'single' and

'individual' nature of the game pieces is now part of the independent claims."  (JA0309

(emphasis added).)

The prosecution history is clear.  The patentee amended his claims to overcome

prior art.  The additional elements must be separate and cannot be combined with the lottery

1    elements.  The patentee's understanding is reflected in the amended claim language which

2    requires the additional elements be "separate."

3           This construction does not render superfluous dependent claim 5.  Dependent

4    claim 5 adds the limitation that "the lottery elements are game pieces which are identically

5    shaped and have different indicia thereon, and wherein said adding step includes the adding

6    of at least one additional game piece which is identically shaped to the lottery game pieces

7    as the additional element to a group formed from the lottery game pieces."  (JA0207.)

8    Claim 5 adds the limitations of game pieces of identical shape, a limitation not expressed in

9    independent claim 1.

10          The Court therefore holds that "separate and discrete additional element" means

11   "an element having no value, and not being available for designating by the player as one of

12   the winning numbers or symbols of the usual lottery series.  A separate and discrete

13   additional element cannot be combined with a discrete lottery element."

14   **C.  Wagering an additional wager on a chance occurrence of the at least one additional element being selected during the selection of some ones of the lottery elements**

15

16
17

| Plaintiff FortuNet's Proposed Construction | Defendant Planet Bingo's Proposed Construction |
|---|---|
| Betting that one or more of the additional lottery elements will be drawn during the play of the game. | Placing a second wager that, among the fixed number of balls to be drawn from the mixing chamber, at least one additional element will be drawn, in addition to and separate from the lottery elements that are drawn. |

18
19
20

21

22          FortuNet argues nothing in the claim language or specification requires that the

23   "additional wager" be a separate wager.  FortuNet argues the player could pay a single

24   predetermined amount to cover both the initial and additional wagers, and the "one fee

25   covers all bets" concept is well known in gaming.  The Court does not understand Planet

26   Bingo to be arguing the wager has to be physically separate, but that the player simply must

be charged an additional price for the second wager.  The Court therefore holds "wagering an additional wager" means "placing another wager, either separately or through an increased purchase price, that one or more of the additional lottery elements will be drawn during play of the game."  (See JA0206, Col. 19 at 48-51.)

Although the parties discuss other claim terms in their briefs, those arguments revolve around the parties' disputes regarding the need for a "ticket," the "fixed" number of balls called, and the patentee's restriction to Figures 9-12.  The Court therefore will not construe these terms individually.

## V.  CONCLUSION

IT IS THEREFORE ORDERED that the disputed claim terms in U.S. Patent Nos. 4,856,787 and 5,257,784 are construed as follows:

| U.S. Patent No. 4,856,787 | |
|---|---|
| Interconnected | Connected with one another. |
| Slave game device | A secondary data processing device for playing games which is connected to the game network and is at least partially controlled by the master game device. |
| Execute concurrently | Play simultaneously, i.e. at once, through a multitasking operating system where each task is a game.  One of those games could operate in the background while the other is played with human interaction. |
| Different distinct and independent games | The games are unique if they have a difference in the rules of play and random factors.  Both the rules of play and random factors must contain a difference.  A game with different rules of play and nonunique random factors would not be covered by the claim language.  The two games can be of the same type and can use the same ball blower or random number generator so long as some other difference in the rules of play and random factors exists. |

| U.S. Patent No. 5,257,784 | |
|---|---|
| Lottery-type wagering game | A game whose outcome is determined by a random selection of only some of a plurality of discrete lottery elements of that game. |
| Separate and discrete additional element | An element having no value, and not being available for designating by the player as one of the winning numbers or symbols of the usual lottery series.  A separate and discrete additional element cannot be combined with a discrete lottery element. |
| Wagering an additional wager | Placing another wager, either separately or through an increased purchase price, that one or more of the additional lottery elements will be drawn during play of the game. |

DATED:    December 30, 2005

_____
PHILIP M. PRO
Chief United States District Judge

29